**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) ) | Case No. 23-11069 (CTG) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF BRIAN WHITTMAN
IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING THE
SETTLEMENT AGREEMENTS BY AND AMONG THE DEBTORS
AND CERTAIN PENSION FUNDS AND (II) GRANTING RELATED RELIEF**

I, Brian Whittman, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation, which has served as financial and restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors") prior to and throughout these chapter 11 cases.

2. In my capacity as Managing Director of A&M and advisor to the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' sale and wind-down efforts.

3. I submit this declaration (this "Declaration") in support of the *Motion of the Debtors for Entry of an Order (I) Approving the Settlement Agreements by and Among the Debtors and Certain Pension Funds and (II) Granting Related Relief* (filed contemporaneously herewith, the "Motion"),[2] which, as noted in the Motion, seeks authorization and approval to enter into each

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

of the individual settlement agreements (each a "Settlement Agreement," collectively, the "Settlement Agreements" or the "Settlements") with each of fourteen multiemployer pension plans ("MEPP") claimants. The fourteen MEPP claimants are Central States, Southeast and Southwest Areas Pension Fund (the "Central States Pension Fund"), four MEPPs represented by Groom Law Group (the "Groom Law Funds"), and nine MEPPs represented by Milbank LLP (the "Milbank Funds" and collectively with the Central States Pension Fund and the Groom Law Funds, the "MEPP Settling Parties" and the Debtors, collectively, the "Settling Parties").

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors (including A&M employees working under my supervision), or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations, financial affairs, and restructuring and liquidity management initiatives. I am over the age of eighteen and am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## Background and Qualifications

5. I have more than thirty years of experience serving as a financial advisor in distressed situations and providing restructuring and performance improvement services to corporations, various creditor classes, equity owners, and directors of financially distressed companies. For the past thirty years, I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, manufacturing, media, mining, and retail. I have also led complex engagements for companies, secured lenders, and creditors, serving in both interim management and advisory roles. I am a Certified Insolvency and Restructuring Advisor and a Certified Public

Accountant.

6. I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and as the group's co-head of the Midwest region since 2019. During my tenure at A&M, among other engagements, I have served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014. In addition, my recent company-side restructuring engagements include, among others, Virgin Orbit Holdings, Fast Radius, Boy Scouts of America, and Paddock Enterprises. Prior to joining A&M in 2002, I spent seven years working as a director in the restructuring practice at a "Big Five" accounting firm.

7. A&M's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance, typically in distressed business and restructuring settings and situations. A&M serves distressed companies, debtors, secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court restructuring engagements. A&M has been managing the Debtors' liquidity, forecasting, and budgeting, as well as generally assisting in financial planning and analysis, which includes developing cash flow forecasts.

8. I am familiar with the facts and circumstances giving rise to the Settlements, and while I am neither an actuary nor an expert on pension fund withdrawal liability specifically, my role as the Debtors' advisor, my consultation with the Debtors' actuary and legal counsel, and my extensive participation in these cases and the settlement discussions formed the basis of my statements and views reflected herein.

9. Based on these, I can attest that the Debtors' evaluation of and ultimate decision to enter into the Settlements was the product of a comprehensive and arm's-length process. The

Debtors' Board of Directors engaged in multiple discussions and meetings regarding the material terms of the Settlements, impact of the Settlements on both settling and non-settling parties and the potential impacts of continued litigation absent the Settlements. In parallel, the Debtors—together with their advisors, including A&M—conducted extensive negotiations with the relevant counterparties and prepared detailed analyses modeling a range of potential outcomes, including both high- and low-case scenarios reflecting estimated outcomes of prolonged litigation on various issues resolved by the Settlements and how the Settlements compared to the rulings to date by the Bankruptcy Court and other courts in these matters. In my view, considering these analyses, the risks and costs inherent in continued litigation, and the robust diligence and negotiation process undertaken, the Settlements represent a reasonable and value-maximizing resolution for the Debtors' estates.

### The Debtors Bankruptcy Proceedings and these MEPP Settlements

10. As set forth in the Motion, in July 2023, the Debtors abruptly ceased operating, resulting in the Debtors' withdrawal from various MEPPs in which they had participated and to which they contributed. I understand that under ERISA, a complete withdrawal gives rise to "withdrawal liability"—effectively an exit charge requiring the withdrawing employer to fund its allocable portion of the MEPP's unfunded vested benefits ("UVBs") with applicable statutory adjustments. In these Chapter 11 Cases, the MEPPs collectively filed proofs of claim exceeding $7.4 billion on account of such asserted withdrawal liability.

11. I understand that, prior to the Debtors' operational shutdown, certain of the MEPP Settling Parties—the Central States Pension Fund, the Groom Law Funds, and three of the Milbank Funds—received special financial assistance pursuant to the American Rescue Plan Act of 2021 (the "SFA Pension Funds"). The six other Milbank Funds did not receive such special financial assistance (these six, the "Non-SFA Pension Funds").

12. As this Court is well aware, in the twenty-seven months these Chapter 11 Cases have been pending, parties extensively briefed and argued disputes arising out of the asserted withdrawal liability claims (among other related liabilities).

13. Additionally, certain SFA Pension Funds asserted related pension fund liabilities. Specifically, Central States Pension Fund filed a claim in the amount of approximately $917 million on account of a 2014 contribution guaranty agreement with the Debtors (the "Central States Contribution Guaranty Claim") and the New York State Teamsters Conference Pension and Retirement Fund (the "NYST Fund") asserted a claim of approximately $76,000,000 for liquidated damages, equal to 10% of the NYST Fund's originally asserted withdrawal liability claim (the "NYST Fund Liquidated Damages Claim").

14. Certain of these disputes were resolved by the Bankruptcy Court but are subject to appeal and continued litigation risk, while others remain unresolved. Based, on my review of analysis prepared by the Debtor's actuary, the Settlement Agreements address and resolve several major outstanding disputes—issues that, if litigated to conclusion, could result in outcomes materially less favorable to the Debtors' estates than the Settlements. It is my understanding that without a consensual resolution, the parties have indicated that they would continue to pursue these matters through further litigation, including appeals, prolonging these disputes for many months or potentially years and imposing substantial expense on the estates.

**A. Calculation of MEPP Claims Under the Settlement Agreements**

15. Withdrawal liability claims for each MEPP Settling Party have been calculated by the Debtor's actuary using a consistent methodology that incorporates the Court's rulings to date and settles certain open issues not fully resolved by such rulings, and separate scenarios have been calculated to account for appellate risk. On April 7, 2025, the Court issued the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan*

*Claims Allowance Disputes* [Docket No. 6030] (the "Preliminary Observations Opinion"). It is my understanding that the Preliminary Observations Opinion provided guidance on the appropriate calculation of withdrawal liability claims, which the parties endeavored to incorporate while reaching as much stakeholder consensus as feasible. Based on my discussions with the Debtors, the Debtors' counsel, and the Debtors' actuary, withdrawal liability claims for each MEPP were calculated, with agreement from all the Settling Parties, and in accordance with the Preliminary Observations Opinion and other decisions from the Court in these cases, pursuant to the methodology explained in paragraphs 32-43 of the Motion. I understand that this methodology reflects a reasonable settlement of legal issues that are fact-intensive, complex questions likely requiring extensive litigation and testimony to resolve. The Settlements obviate the need to further litigate these questions.

16. Equally important, the impact of the Settlements on the holders of non-joint and several general unsecured claims will be minimized through contributions by each MEPP Settling Party. Because the claims asserted by the MEPPs are joint and several claims against each of the Debtors, the holders of MEPP claims are entitled to distributions from each Debtor to the extent of their allowed claims. In contrast, a substantial majority of the other non-MEPP general unsecured claims asserted against the Debtors are not joint and several claims and, therefore, the vast majority of the Debtors' general unsecured creditors are entitled to distributions from only a single Debtor to the extent of their allowed claims (and, as a result, the recovery percentages for MEPP claims on an aggregate basis are substantially higher than the recovery percentages for non-joint and several general unsecured claims). Accordingly, any increase to the allowed withdrawal liability claims of MEPPs has the effect of adversely and disproportionately impacting the recovery percentage for holders of non-joint and several general unsecured claims. For this reason, each

Settlement Agreement provides that the applicable MEPP Settling Party will contribute up to its pro rata share of an approximately $7.4 million contribution[3] for the benefit of non-joint and several general unsecured claimants to ensure such non-joint and several general unsecured claimants are not unduly burdened by the Settlements (the "Non-J&S GUC Contribution").

**B. The Settlement Agreements are in the Best Interest of the Debtors' Estates**

17. Relying upon the input of the Debtors and the Debtors' counsel, and upon my participation in extensive meetings with the Debtors' Board of Directors, and my understanding of the extensive negotiations with the Settling Parties, I believe that the Settlements are in the best interest of the Debtors' estates. I reviewed each of the Settlement Agreements and I analyzed the allowed claim amounts and the expected claims recoveries of both the Settling and non-Settling Parties under the Settlement Agreements as compared to both a baseline of the Preliminary Observations Opinion and other rulings to date and to alternative scenarios of losing different matters on appeal constructed by the Debtors' actuary with input from Debtors' counsel. In reviewing these comparisons, I determined that each Settlement is, to varying degrees, better than various alternatives in terms of the impact to the non-Settling Parties and is also reasonable versus the baseline when considering the incremental cost and time of continued litigation.

18. Given the high value of the claims at stake for each of the Settling Parties, the Debtors have engaged in good faith, arms' length negotiations with each of the MEPP Settling Parties to resolve such claims. As a result of this negotiation process, which over the course of more than two years has involved extensive litigation between the Debtors and each of the MEPP Settling Parties, the Settling Parties finally reached these Settlement Agreements. In the aggregate,

---

[3] The approximately $7.4 million contribution assumes that the Debtors' cash on hand immediately prior to the Effective Date of the Plan is between $600-700 million. To the extent that the Debtors' cash on hand immediately prior to the Effective Date and prior to any distributions contemplated by the Plan is less than $550 million, the aggregate contribution, and each Settling Party's pro rata share, may be adjusted.

the expected cost of fully litigating all MEPP claims, combined with the risk of further appeals and rulings on the merits of such claims, which may be unfavorable, exceeds the Debtors' cost of settling with the MEPP Settling Parties per the Settlement Agreements—this is largely due to the fact that much of the cost of the Settlements are borne by certain of the MEPP Settling Parties or other parties that have affirmatively indicated support for the Settlements. Given this determination, I believe entry into the Settlement Agreements maximizes the value of the Debtors' estates for the benefit of all stakeholders.

19. *First*, it is my understanding that the Debtors are not certain to attain a favorable outcome in litigating the underlying claims against any of the MEPP Settling Parties. While the Debtors have conviction in their legal positions, the Court, as well as the United States Court of Appeals for the Third Circuit, which affirmed the Court's rulings on certain issues, has already ruled against the Debtors on important issues at stake. The precedential history thus substantiates the real risk that further litigation may not go the Debtors' way. Absent the Settlement Agreements, the issues the Debtors face against any one of the MEPP Settling Parties would result in even further extensive, protracted litigation, the outcome of which is uncertain, and the cost to litigate is high in terms of both time and money.

20. Particularly, the Central States Contribution Guaranty Claim remains subject to significant dispute and uncertainty. In keeping with the Debtors' value-maximizing approach to settlement, the Debtors' ultimate decision to resolve Central States Contribution Guaranty Claim was based largely on the Debtors' assessment of the direct costs of litigation as well as the appellate litigation risk of reversal. Further, the NYST Fund Liquidated Damages Claim is subject to pending objection.

21. Continuing pursuit of these settled claims would subject the Debtors to value-

destructive litigation to the detriment of all their stakeholders, including the MEPP Settling Parties. As evidenced by the lengthy, hard-fought, and contentious litigation leading up to this point, material risks remain in resolving the billions of dollars of withdrawal liability claims of the MEPP Settling Parties. The Debtors have engaged in extensive appellate litigation, and themselves face the risk of future appeals, which, based on my experience in other large chapter 11 cases and in the Debtors' cases, specifically, I estimate would cost tens of millions of dollars to litigate absent the Settlements.

22. Further, absent settlement, significant incentives exist for each of the MEPP Settling Parties to continue pursuing their claims at the expense of both the Debtors' estates, and the other MEPP Settling Parties. This is because success on the merits for any certain MEPP Settling Party is at the expense of all other Settling Parties, including other MEPPs. For example, if Central States Pension Fund were to successfully litigate the Central States Contribution Guaranty Claim, this would have significant detrimental impact on the other MEPP Settling Parties, the Debtors' estates, and holders non-joint and several claims.

23. The Settlement Agreements spare the Debtors' estates the multimillion-dollar costs and delays of litigating the matters related to these various complex and costly disputes. For these reasons and more, the Debtors' business judgment is sound and the Settlements offer a reasonable and fair resolution of the claims at issue.

24. *Second*, it is my understanding that the avoided litigation would be complex, expensive, inconvenient, and time-consuming, likely requiring lengthy evidentiary proceedings before this Court. I believe the efficient resolution of the underlying disputes through the Settlement Agreements will reduce expenses and inconvenience in these chapter 11 cases and that the advantages of the Settlement Agreements will inure to the benefit of all stakeholders. For each

of the Settlement Agreements and pursuant to the corresponding Term Sheets, the Debtors and each respective MEPP Settling Party agreed to settle, waive, and/or release all claims against one another. Therefore, the Settlement Agreements each eliminate the effort and expenses otherwise required to adjudicate the underlying disputes and claims.

25. **_Finally_**, with respect to the interest of creditors, approving the Settlements is likely beneficial to the creditors and other stakeholders in these Chapter 11 Cases. Further litigation would only increase administrative expenses and, in turn, erode potential recoveries. Given the meaningful risk of adverse outcomes if the disputes were litigated to finality, achieving a comprehensive and definitive resolution of the MEPP Claims through the Settlements is plainly advantageous to the creditor body. In addition, each Settlement includes the Non-J&S GUC Contribution, which ensures that the costs of implementing the agreements are not shifted onto non–joint and several general unsecured creditors—an outcome that stands in stark contrast to the significant expense and delay that continued litigation would impose directly on those same creditors. For these reasons, the Debtors' decision to enter into each Settlement warrants approval.

26. For the reasons set forth above, I respectfully submit that the Court should grant the relief proposed in the Motion so that the Debtors may enter into the Settlement Agreements with each of the MEPP Settling Parties. I believe that the Settlement Agreements are fair and reasonable and are a sound exercise of the Debtors' business judgment. I believe that the Settlement Agreements are the result of extensive, hard-fought, arm's length negotiations, and are beneficial to the Debtors' estates. I believe that, on the contrary, it would be value-destructive for the Debtors to expend any further estate resources to litigate the claims addressed by the Settlements. Hence, I believe entry into the Settlement Agreements is in the overall best interests of the Debtors, their creditors, and other parties in interest and will maximize the value of the

Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  November 26, 2025	/s/ Brian Whittman
	Brian Whittman
	Managing Director
	Alvarez & Marsal, LLC